IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

DAVID ABERNATHY                                                                         PETITIONER

VS.                                                       CIVIL ACTION NO 3:11cv53-DPJ-FKB

TIM PALMER                                                                              RESPONDENT

## REPORT AND RECOMMENDATION

David Abernathy was convicted of sexual battery in the Circuit Court of Rankin County, Mississippi and sentenced to a term of thirty years, with twenty years suspended and five years of supervised release. His conviction and sentence were affirmed on appeal, and his motion for post-conviction relief was denied. Presently before the Court is his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Having considered the petition and response, the undersigned recommends that habeas relief be denied.

## I. FACTS AND PROCEDURAL HISTORY

The incident underlying Abernathy's conviction occurred on September 6, 2005, in the home of Justin Gordon and Jennifer Pigg in Pearl, Mississippi. Abernathy, a friend of Gordon, arrived at the home in the early evening. Abernathy was in the process of moving, and he planned to spend with Gordon and Pigg. Meanwhile, Lori Fayette, a close friend of Pigg, had arranged to spend the night in the home because her fiancé was out of town. Fayette arrived after Abernathy. During the evening, Fayette became ill with a migraine headache and went to bed in the guestroom. Arrangements were made for Abernathy to sleep on the couch in the living room. According to Fayette, after Gordon and Pigg had gone to bed, Abernathy came into her room and sexually assaulted her.

Fayette fled the home in her car.

Abernathy was indicted and tried for sexual battery.  The prosecution's case consisted of the testimony of the victim, Gordon, Pigg, and the investigating officer.  Abernathy testified on his own behalf and denied having sexually assaulted the victim.  He also attempted to call Dr. Howard Katz as an expert witness to testify that a person experiencing a migraine headache may misperceive reality.  The trial judge refused to allow the testimony, concluding that it was not relevant. The jury convicted Abernathy, and he was sentenced to thirty years, with ten years suspended, and five years of supervised release.

On appeal, Abernathy raised two issues: That the trial court erred in excluding Dr. Katz's testimony, and that the evidence was insufficient to support the verdict.  The Mississippi Supreme Court affirmed.  *Abernathy v. State*, 30 So.3d 320 (Miss. 2010).  As to the first issue, the court held that Defendant had failed to preserve the issue for appeal because defense counsel had not made a sufficient proffer of Dr. Katz's testimony.  The Court found the second issue to be without merit.  Abernathy then filed with the state supreme court an application for post-conviction relief, raising as his single issue the ineffectiveness of his trial counsel in failing to make an adequate proffer of Dr. Katz's proposed testimony.  The supreme court denied relief in a summary order, stating that Abernathy had failed "to make a substantial showing of the denial of a state or federal right."

In his § 2254 petition, Scott asserts a single ground for relief: That his trial counsel was ineffective for failing to make an adequate proffer of his expert's proposed testimony.

## II.  EVIDENCE PRESENTED AT TRIAL

Lori Fayette was 22 years of age and engaged to be married at the time of the incident.  Fayette testified that she was close friends with Pigg and often spent the night with Pigg and Gordon when her fiancé was out of town because she did not like to stay at home alone.  When she arrived at Pigg's and Gordon's home on the evening of September 6, 2005, Abernathy, whom she did not know, was already there.  During the early part of the evening, Fayette and Pigg spent much of their time away from Abernathy and Gordon, who were drinking beer and visiting in another part of the house.  Abernathy did, however, express an interest in Fayette, asking her if she had a boyfriend and whether he "made her happy."  Fayette told him that she was engaged and made it clear that she was not interested.

Earlier in the day, Fayette had developed a headache, which worsened as the evening progressed.  At trial, she described the headache as a migraine, stating that she had been diagnosed with migraine headaches when she was in high school  At one point in the evening, Fayette became nauseated and, because the nearest bathroom was occupied, she went outside and vomited.  Abernathy offered to assist her, and, at her request, brought her a wet cloth.  Around 8:30 or 9:00 p.m., Fayette went into the guestroom to sleep.  On at least one occasion, Abernathy opened the door to the bedroom and asked if she needed anything, but Fayette stated that she did not and requested that he leave.  Fayette heard Pigg tell Abernathy to leave Fayette alone.  She then drifted off to sleep.

Fayette testified that she awakened some time later to find herself on her back with Abernathy on top of her. Abernathy was holding her hands behind her head with his left arm, was holding her legs down with his right leg, was fondling her breast with his right hand, and was licking her face and ear. She testified that she "freaked out," finding herself unable to move and barely able to speak, other than to tell Abernathy to stop and to get off of her. Abernathy told her not to scream or say anything. He then removed her shorts and underwear and penetrated her vagina with his fingers. In an attempt to frighten Abernathy, Fayette faked a seizure. Abernathy responded by shaking her repeatedly. He then put her clothes back on her, covered her with the blanket, and left the room. Fayette waited a few moments until the house was quiet again and then picked up her small dog which she had brought with her and went in the living room to retrieve her keys from the coffee table. Abernathy, who was sitting on the couch, grabbed her arm and told her that she had a fever, was having a bad dream, and needed to go back to bed. Fayette told him never to touch her again. Abernathy responded by laughing. She then went out to her car and drove home. On the way, she repeatedly tried to call the Pigg and Gordon on their cell phones. At first they did not answer, but when they did, Fayette's impression was that they were still so asleep that they did not really understand what she was trying to tell them.[1] Once she arrived at her home, Fayette sat on the front porch for the rest of night because she was afraid that Abernathy had followed her home. The next day, she and Pigg went to the police station when Pigg got off of work. Fayette sought counseling after the incident.

---

[1] According to their own testimony, Pigg had taken an Ambien and Gordon was intoxicated.

4

The testimony of the Pigg and Gordon was generally consistent with that of Fayette concerning the events prior to and following the attack. Gordon admitted that both he and Abernathy drank beer throughout the evening and became intoxicated. After Gordon and Pigg went to bed, Pigg received a call from Fayette, who was hysterical and crying, but Pigg, who had taken an Ambien, was too sleepy to talk with her. Pigg gave the phone to Gordon, who testified that Fayette told him that Abernathy had attempted to rape her. Gordon went into the living room and asked Abernathy what had happened. Abernathy responded by telling Gordon that Fayette had made a pass at him. Gordon, realizing that Fayette was out of the house and that Abernathy should not be allowed to drive, told Abernathy to go back to sleep. The next day he and Pigg realized what had happened, and Pigg accompanied Fayette to the police station.

Abernathy took the stand at trial. He described his concern for Fayette during the evening and his attempts to help her because she was ill. He admitted going into her bedroom twice. The first time he merely stuck his head in the door. He went into the room a second time after the Pigg and Gordon had gone to bed in order to retrieve his gym bag, which he had placed there earlier. When he went into the room this second time, Fayette was moaning and talking in her sleep. On direct examination, Abernathy said he walked over to the bed to try to understand what she was saying and talk to her, but that he did not get a response. On cross-examination, he stated that he sat down on the bed and that Fayette grabbed him and tried to kiss him. Not being interested because of a recent break-up with his girlfriend, he left the room. A few minutes later, Fayette came out of the bedroom, retrieved her keys, and stated that she was leaving. Abernathy

5

testified that Fayette had not encouraged him during the evening and that it was obvious she was ill when she made the pass at him.

### III.  STANDARD OF REVIEW

Abernathy's claim was adjudicated on the merits by the Mississippi Supreme Court in his post-conviction proceeding.  It is therefore subject to the highly deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), which allows habeas relief in this case only if the state court's rejection of Abernathy's claim involved "an unreasonable application of . . . clearly established Federal law . . .  as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts" in light of the evidence presented to the state court.  *Id.*  The Supreme Court has repeatedly emphasized that " 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411.  Rather, the application must be not only incorrect but also "objectively unreasonable." *Renico,* 130 S.Ct. at 1862 (quoting *Williams*, 529 U.S. at 409).

Review of a claim of ineffective assistance of counsel is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  Analysis of ineffective assistance claims begins with the well-known test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), a test which is "highly deferential," *id* 689.  Under *Strickland's* two-prong analysis,

6

a petitioner must first show that his attorney's performance was deficient. 466 U.S at 688. "Deficient" means that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 690. If a petitioner succeeds in establishing deficiency on his counsel's part, then he must go on to demonstrate that his attorney's deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. As stated, the standard of review of an attorney's performance is "highly deferential," and a court considering an ineffectiveness claim is to "indulge a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance." *Id.* at 689. The difficulty faced by a habeas petitioner in seeking to establish a claim of ineffective assistance is compounded when the claim is viewed through the lens of § 2254(d). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland'*s deferential standard." *Harrington v. Richter,* 131 S.Ct. 770, 788 (2011).

In short, a habeas petitioner's burden of overcoming AEDPA's deferential standard of review is an extremely difficult one; the burden only increases where a petitioner is asserting ineffective assistance.

### IV.  ANALYSIS OF CLAIM

The trial court heard argument on the admissibility of Dr. Katz's proposed testimony at the beginning of the defense's case-in-chief. Defense counsel described the proposed testimony as follows:

> [T]he migraine headaches, and this is what Dr. Katz will show, migraine headaches are responsible for a wide variety of, let's say misperceived, misperceived events in one's life while they're having such. In other words, the sufferer of a migraine headache may perceive something about their environment that is not actually there, which is not part of that environment, and testimony today would be merely to give case history an example of that and nothing more.

Docket no. 7-3 at 58-59. The trial court concluded that the testimony should be excluded because it was not relevant:

> [M]y observation at this point is this that, (1) I hadn't heard any testimony that - of a medical nature that would classify this headache this lady had as a migraine headache. There's no medical testimony to that. She said she had a headache . . . she used the term migraine headache to describe it. But other than her saying that, I don't know that it's a migraine. There's been no testimony to indicate that this lady has ever suffered from any hallucinations with or without a headache. We don't know the severity of the degree of the headache. There's no evidence about that.
>
> Unless I'm told otherwise, I'm not sure that Dr. Katz knows what the medical history of this victim is, if it's ever even been reviewed by him. I don't whether or not he's ever examined this victim.
>
> Medications taken. The witness is not even sure what medication she's taken, whether - or what it was, so we don't know how that would affect this headache.
>
> If Dr. Katz is going to testify as to generally the case histories and generally to how migraine headaches affect people, that doesn't mean that it affects this woman that way. It might. It might not. Unless you can come up with something to tie his testimony to this witness, it's not relevant as far as I'm concerned and I'm deciding it on a relevancy issue and not on a medical issue. . . . If you think you can get it to that point, . . . I'll reconsider it. But at this point, I don't see how.

Docket no. 7-3 at 60-61.[2]

The first prong of *Strickland* requires Abernathy to establish deficient performance. Under Mississippi law, all that was required for preservation of the issue of Dr. Katz's

---

[2] In his post-trial motion, Abernathy once again challenged the court's exclusion of Dr. Katz's testimony, and the trial judge reaffirmed his belief that the testimony was not relevant because of the lack of proof that the victim was suffering from a migraine headache on the night of the attack. Docket no. 7-4 at 4-9.

testimony for review was for counsel to either state "into the record what [was] expected to be proven, or in the absence of the jury have the witness answer the questions." *Brown v. State*, 338 So. 2d 1008, 1009-10 (Miss. 1976). The state supreme court has observed that "[t]he standard for effecting a proffer is a rather low threshold." *Vaughan v. State*, 759 So. 2d 1092, 1101 (Miss. 1999). Defense counsel clearly informed the trial court that Dr. Katz would testify that a migraine headache may cause the sufferer to misperceive events. There is a reasonable argument that this proffer was sufficient to enable the trial court to "judge the competency of the proffered evidence." *See Brown*, 338 So. 2d at 1010; *Harrington*, 131 S.Ct. At 788. For this reason, Abernathy is not entitled to habeas relief.[3]

---

[3]The state supreme court's finding on direct appeal that the proffer was inadequate has no effect on this court's analysis. First of all, habeas review does not include review of the reasoning behind a state court's ultimate decision. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Thus, for example, even if the state court had specifically addressed each *Strickland* prong in its denial of post-conviction relief, and had concluded, consistent with its opinion on direct appeal, that defense counsel's performance had been deficient (but had nevertheless denied relief for some other reason, such as the absence of prejudice), this court would neither be bound by, nor owe any deference to, that subsidiary finding. *See John-Charles v. California*, 2008 WL 5233589, at *20 (E.D. Cal.) (observing that AEDPA deference is not implicated when a subsidiary issue, which may be dispositive, has been found in petitioner's favor, and concluding that habeas court may make an independent determination on the issue). It follows that the fact that the state court indicated in an earlier ruling that counsel's performance was deficient has no bearing on this court's review.

## V. CONCLUSION

Petitioner has failed to establish that the state court's adjudication of his claim of ineffective assistance was contrary to, or involved an unreasonable application of, clearly established Supreme Court law or was based upon an unreasonable determination of the facts. Accordingly, the undersigned recommends that habeas relief be denied and the petition be dismissed with prejudice.[4]

---

[4] Notably absent in Abernathy's petition is any direct claim based upon the exclusion of Dr. Katz's testimony. The state court's finding that defense counsel failed to make a sufficient proffer, and its resulting refusal to consider Abernathy's claim regarding the exclusion of testimony, likely resulted in Abernathy's focusing his habeas petition solely on his attorney's performance, rather than including a due process claim in his petition. Obviously, this court is under no obligation to consider such a claim when Abernathy has failed to raise it. Nevertheless, because of the confusion that may have been created by the state court's opinion, the undersigned has considered whether such a claim would have merit and has concluded that it would not. Habeas relief is available based upon the wrongful exclusion of evidence only if the exclusion "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637. In determining whether this standard has been met, a court considers (1) the importance of the testimony; (2) whether the testimony was cumulative; (2) whether there was evidence corroborating or contradicting the excluded testimony; and (4) the overall strength of the prosecution's case, with the latter factor being the most important. *Cupit v. Whitley*, 28 F.3d 532, 539 (5th Cir. 1994). Dr. Katz's testimony could be considered somewhat important and was not cumulative or otherwise corroborated; nevertheless the strength of the state's case against Abernathy suggests that the exclusion of the testimony did not have a substantial and injurious effect on the verdict. While there was no physical evidence of the assault, the prosecution's case was nevertheless strong: The victim gave a detailed and extremely credible account at trial of the attack, and there was no evidence to the contrary, other than Abernathy's testimony. Even assuming that Dr. Katz's testimony should have been allowed, it is simply not plausible that a jury would have acquitted Abernathy because of expert testimony suggesting that the victim simply imagined the entire incident because she was suffering from a migraine headache. For this reason, the undersigned concludes that habeas relief would not be warranted based upon the exclusion of the testimony.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court.  28 U.S.C. § 636; Fed. R. Civ. P. 72(b); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Respectfully submitted, this the 4th day of September, 2013.

/s/ F. Keith Ball
UNITED STATES MAGISTRATE JUDGE